Filed 3/3/14  P. v. Legardy CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>RONALD LEGARDY,<br><br>      Defendant and Appellant. | B243172<br><br>(Los Angeles County<br> Super. Ct. No. NA089995)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed herein on February 4, 2014, be modified as follows:

      1.  On page 19, part C, third paragraph, third sentence beginning, "His counsel ably" is modified, so the sentence reads:  "His counsel ably represented him, bringing a *Romero* motion and arguing to strike one of the prior robbery convictions."

      2.  On page 19, part C, third paragraph, end of the fourth sentence stating, "Defendant does not suggest in what manner his presence would have made a difference in the outcome," a footnote is added stating as follows:

"Defendant argued for the first time in his reply brief on appeal reasons why his presence at the sentencing hearing would have made a difference. Arguments made for the first time in a reply brief will not be considered unless good reason is shown for failure to present them before. (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1232.) No good reason has been offered here."

3. On page 28, section VII, the first full sentence and the word "Additionally" of the second sentence are deleted, so the paragraph starts with: "The abstract of judgment should be modified to reflect the $160 court security fee pursuant to section 1465.8 ($40 per count), and the $120 criminal conviction assessment pursuant to Government Code section 70373 ($30 per count)."

4. On page 29, Disposition, the first sentence is modified, so the sentence reads: "We direct the trial court to correct the abstract of judgment to reflect this court's opinion and to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation."

This modification changes the judgment.

Appellant's petition for rehearing is denied.

EPSTEIN, P.J.                    WILLHITE, J.                    EDMON, J. [*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B243172 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA089995) |
| v. | |
| RONALD LEGARDY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tomson T. Ong, Judge.  Affirmed as modified.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant Ronald Legardy of four counts of attempted carjacking (counts 1-4). (Pen. Code, §§ 664, 215, subd. (a).)[1] In a bifurcated court trial, the court found true allegations pursuant to section 667.5, subdivision (b), that defendant had served four prior prison terms for four prior convictions, including two separate convictions for robbery on June 30, 2004, in case number FVA019626. The court also found that the two prior robbery convictions were "strike" convictions under sections 667, subdivisions (b) through (i) and 1170.12, subdivisions (a) through (d). The trial court sentenced defendant to an aggregate term of 115 years to life in state prison.

On appeal, defendant makes multiple contentions of error. He contends the trial court erred: (1) by committing judicial misconduct; (2) by failing to suspend the proceedings to determine defendant's competency; (3) by conducting sentencing in defendant's absence; (4) by refusing to strike one of two "strike" priors arising out of the same incident; (5) by permitting him to be convicted of three counts of carjacking against victims without possessory interest in the vehicle; and (6) by imposing a sentence that constituted cruel and unusual punishment. Because we disagree with defendant's contentions and find no error requiring reversal, we affirm the judgment.

# FACTUAL BACKGROUND

## I.     The Prosecution Case

### A.     *The Attempted Carjacking*

On September 1, 2011, Michael Bachicha and his daughter Crylene were riding in Bachicha's car along with Bachicha's girlfriend, Tracy Jackson, and her daughter Alisa. Bachicha was driving and the girls were in the backseat. They entered the parking garage for Bachicha's mother's condominium complex in Long Beach around 5:30 p.m. Just before driving into the parking garage, Bachicha noticed a tall African-American man

---

[1]     All further undesignated references are to the Penal Code.

standing in the middle of the street. The man was wearing a baseball hat and carrying a bag.

Bachicha parked in the garage and exited the car, as did Jackson and Crylene.[2] As Bachicha walked behind his car toward the passenger side, he saw the man he had just seen in the street approaching them on the passenger side of the car. Defendant was about 30 feet away and Bachicha looked at him for about five seconds. Defendant told Bachicha to give him the keys to his car. Bachicha walked toward defendant and asked him what he had said. Defendant repeated, "Give me the keys to your car," and lifted his shirt to reveal a gun in his waistband. Considering that the children were with him and fearing for their safety, he flung the keys at defendant—whom Bachicha initially testified was standing three to four feet away, but later said was 30 feet away—and turned to help eight-year-old Alisa exit the passenger side of the backseat. Even though Bachicha had thrown the car keys, defendant said, "Give me the keys or I'm going to fucking kill you." Jackson screamed because she saw defendant pull a gun out of his waistband and hold it at his side. Jackson noticed that defendant was holding an orange or red backpack. As Bachicha was getting Alisa out of the car, Jackson saw that defendant had put the keys in the ignition but was not sitting in the car. When Alisa was out of the car, Jackson told Crylene and Alisa to run. Bachicha grabbed Jackson's arm and they ran to the security office, with Bachicha and Jackson yelling for someone to call the police. As they ran Jackson looked back and saw that defendant had begun rummaging in the backseat.

Jackson left the security office and ran back into the garage and out an exit gate, following defendant and yelling at him. She saw him run out of the garage and up a hill next to the condominium complex in the direction of the beach. He turned back once and looked at her as he ran. She did not see defendant carrying the orange or red backpack as he ran away. The police arrived at that moment, as Jackson was still able to see defendant running away.

---

[2]     Crylene was 15 years old at the time of trial.

The 911 dispatch officer described the suspect to the police as being six feet two inches tall, 220 pounds, heavyset, clean shaven, carrying a red backpack, and wearing a red baseball hat, white t-shirt, and jeans. The police pursued a suspect matching that description outside an apartment complex one block away from the attempted carjacking. The police set up a containment area but were not able to apprehend the suspect, although one police officer momentarily saw the suspect on the third floor of the complex, wearing a red hood or red baseball cap. The police found a blue or black backpack during a search of the area but determined that it was not related to the red backpack described in the 911 dispatch call.

The jury was shown video surveillance footage showing the front entrance of the parking garage. The video showed Bachicha's car pulling into the driveway of the garage, and a man wearing a baggy white sweater and carrying a red backpack. The video later shows Bachicha, Jackson, Crylene, and Alisa running.

Defendant had left the car keys in the ignition. No fingerprints were taken from the car.

### B.    *Physical Evidence*

Early the following morning, Donald Purvis was bicycling in a parking lot near the condominium complex and noticed what appeared to him to be a nine-millimeter pistol on the ground. Purvis put the weapon in a plastic bag along with cans he had collected and found a harbor patrol officer. Marine patrol officer Akins identified the pistol as a pellet gun. The pellet gun was not fingerprinted because the circumstances of its recovery indicated it was unlikely to yield valid prints.

That same day, Mary Feddis, a member of the board of directors of the homeowners' association of the condominium complex, was making a routine walk around the property to check the lighting and landscaping and found a red backpack partially hidden in the bushes along a path leading to a locked gate residents used for beach access. She notified the police about the backpack, then left it unattended for about one hour until the police arrived. She showed it to Long Beach Police Officer

4

DeLosh, who unzipped it but did not take anything out in her presence. She could see there was a book and a wig in the backpack.

Officer DeLosh gave the backpack to Long Beach Police Officer Francisco Vasquez. Officer Vasquez noted there were no identifying marks on the outside of the backpack. Underneath a wig and a book he found a Samsung phone charger. He also found two documents, one dated five months earlier (Apr. 27, 2011) and bearing defendant's name, and the other a subscription flyer bearing defendant's name and the address 25957 Baseline, Apartment 147, San Bernardino. Finally, there were two plastic pellet gun cylinders and some .177 pellets. The items were booked into evidence. Jackson was shown the backpack and said that it "could be" the backpack she saw the perpetrator holding.

### C. *Identification Evidence*

Crylene described the perpetrator as being African-American, wearing jeans, a hat, and carrying a backpack. She did "[n]ot exactly" remember the color of the backpack but said it was "[d]ark, like a blue or black." She did not see the perpetrator's face during the incident and could not identify the perpetrator as being present in the courtroom.

Bachicha said the perpetrator was about six feet tall, male, Black, wearing a hat, with no tattoos or facial hair. Police prepared a photographic six-pack lineup that included a photograph of defendant and the photographs of five other men. Bachicha was shown the six-pack the day following the incident. After examining it for five to seven seconds, without hesitation Bachicha positively identified defendant's photograph, in position 2, as "the guy [who] told me to give him the keys." Jackson also examined the six-pack the same day but was unable to identity anyone as the perpetrator. She indicated she was still upset and, at the time of the incident, had been more focused on the gun.

About 45 days later, the police held a live lineup that included defendant. Neither Bachicha nor Jackson was able to make an identification.

5

The lead detective, Long Beach Police Detective Rudy Romero, spent about 40 minutes with defendant the day after he was arrested on September 12, 2011. Detective Romero attended the live lineup. He testified at trial that he had difficulty identifying which of the lineup subjects was defendant because defendant had changed his appearance, had grown his hair out and had a beard, and also appeared thinner, at the time of the live lineup.

Bachicha and Jackson identified defendant in court at the preliminary hearing on November 22, 2011, as the man who attempted to take Bachicha's car.

When Bachicha was asked at trial if he saw in the courtroom the man he had seen in the street, Bachicha said he did not. At trial, Jackson identified defendant as the man who demanded the car keys and said she had no doubt defendant was the perpetrator.

### D. *Cellular Telephone Records*

A custodian of records for Metro PCS testified regarding activity on defendant's cell phone on September 1, 2011, and the morning following. The custodian testified that when a person dials a number on his or her cell phone, the phone connects with the closest cell tower with the strongest signal (within at most about a one and one-half mile radius), and the tower records the number of the cell phone, its serial number, the date and time, and the number called. On the morning of September 1, 2011, a call was made using defendant's cell phone that used a cell tower in San Bernardino. Around noon that day, calls were made using cell towers in Los Angeles. At 4:40 p.m. and 4:58 p.m., more calls were placed using cell towers in Los Angeles. At 8:45 p.m. and the minutes following, incoming calls were received using cell tower number 761 at East 4th Street in Long Beach, the closest tower to the condominium complex at which the crimes occurred. At 8:57 p.m. and shortly thereafter, several more calls were received using a cell tower at Pine Avenue in Long Beach. These calls were placed to defendant's wife. Defendant's cell phone was then used over the next several hours in various locations in Long Beach, Los Angeles, Rialto, and finally San Bernardino the following morning.

6

When defendant was arrested on September 12, 2011, during booking he surrendered his Samsung cell phone, which bore the same serial number as the one indicated in the Metro PCS phone records introduced at trial. The phone worked with the charger found in the red backpack. Defendant gave contact information identifying his wife, whose address was 25957 East Baseline in San Bernardino, with a telephone number that corresponded to one that made and received calls to and from defendant's cell phone on the date of the crimes.

## II.     Defense Evidence

Dr. Robert Shomer, an experimental psychologist, testified as an expert in eyewitness identification. He opined that even under the best circumstances eyewitness identification does not carry a high degree of reliability, and under less than ideal circumstances—for example when a witness is in a threatening or stressful situation—its reliability decreases significantly. If a weapon is present the witness tends to focus on it rather than on the suspect's face. If the race of the witness differs from that of the person being observed, the accuracy of the identification decreases significantly.

Dr. Shomer opined that the person conducting a photographic lineup should not know who the suspect is to avoid unintentionally influencing the process. The possibility of getting an erroneous identification is increased if the person conducting the procedure knows in which photograph the suspect is depicted. He also stated that showing a witness sequential pictures is preferable to placing all of the photographs on the same page, because in the former procedure the witness compares his or her memory to only one exemplar at a time rather than using a process of elimination as in the latter procedure. Live lineup procedures allow for more accuracy because they show the entire body, in three dimensions, making them the best technique available. Dr. Shomer stated that giving an admonition is better than not giving one, but pointed to research that indicated the standard admonitions given before identification procedures are often not fully understood by eyewitnesses.

Asked to explain what could cause an eyewitness to identify a suspect in a photographic six-pack but be unable to later identify the suspect in a live lineup, Dr. Shomer said it is much easier for people to resemble each other in flat, two-dimensional, small photographs than it is for people to resemble each other in three-dimensional live lineups in which the eyewitness can see the whole body.

Dr. Shomer stated on cross-examination that his opinions were based in part on thousands of studies involving soldiers that demonstrated that an increase in stress level decreases the accuracy of eyewitness identifications. He knew of only two studies in which the subjects of the study were victims of violent crime.

Dr. Shomer stated that in-court identifications merely confirm a prior choice made by the eyewitness, but with only one defendant sitting in court, such identifications are unreliable.

## DISCUSSION

### I.  Judicial Misconduct Regarding Eyewitness Identification

Defendant contends that the trial court committed various acts of misconduct in its evidentiary rulings and questioning of witnesses. In the trial court, defendant made no objection at any time that the court's conduct constituted judicial misconduct. In order to preserve a claim of judicial misconduct arising out of the trial judge's questioning of witnesses, comments, and evidentiary rulings, a defendant must make an objection on the ground of judicial misconduct in the trial court and request a curative admonition. (*People v. Hines* (1997) 15 Cal.4th 997, 1041.) This rule exists because a timely objection allows the court to obviate any potential prejudice it may have caused and cure any appearance of bias. (*People v. Wright* (1990) 52 Cal.3d 367, 411, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458-459.)

Defendant contends that any objection to the court's conduct would have been futile because "the judge asked the question[s]." However, we see nothing in the record that would suggest that calling the judge's attention to the fact that his conduct suggested

8

to the jury that he was biased in favor of the prosecution would not have been seriously entertained. (Cf. *People v. Sturm* (2006) 37 Cal.4th 1218, 1237 [any objection to judicial misconduct regarding frequent disparaging comments about defense counsel and defense witnesses would have been futile where "evident hostility" between judge and counsel gave counsel impossible choice of objecting and thereby provoking further misconduct, or of giving up client's right to challenge misconduct on appeal].) Thus, defendant's claims of judicial misconduct are forfeited.

In any event, there was no misconduct. "'The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered.' [Citation.] To this end, 'the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination.' [Citation.] The trial court has a statutory duty to control trial proceedings, including the introduction and exclusion of evidence. [Citation.] As provided by [Penal Code] section 1044, it is 'the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.' However, 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant.' [Citation.]" (*People v. Sturm*, *supra*, 37 Cal.4th at p. 1237.) In the instant case, the trial court did not depart from its impartial role.

Defendant first attempts to raise to the level of misconduct one question the court asked Detective Romero—about differences he saw between defendant's booking photo and his photo in the live lineup—and the overruling of several of defense counsel's objections to the prosecutor's purportedly leading questions of the detective. He also complains that the trial court interrupted defense recross-examination of Officer Scaccia to ask him to explain why he chose photos of persons with facial hair to place in the photographic lineup.

Of course, as defendant concedes, mere erroneous evidentiary rulings (assuming without deciding such errors occurred here) against a party do not constitute misconduct,

9

especially when they could be raised as individual errors. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112.) Here, defendant has chosen not to challenge the court's questioning of witnesses or its evidentiary rulings on their merits, and simply asserts, without adequate argument or authority, that they are erroneous. We thus have no occasion to address the merits, and we find no hint of misconduct in the rulings. Further, we find the court's questioning of Detective Romero and Officer Scaccia proper, because it was merely clarifying and sought to elicit material facts. (*People v. Cook* (2006) 39 Cal.4th 566, 597.)

Next, defendant contends that the trial court treated his sole witness, Dr. Shomer, and his testimony concerning eyewitness identification testimony, with hostility. The record does not support the claim.

Before Dr. Shomer testified, the court admonished counsel to inform Dr. Shomer not to discuss other cases, such as ones handled by "Project Innocence," in which convictions based on eyewitness identification were reversed. The court stated: "If he brings that up, I'll strike his testimony." The court noted, "[h]e is here solely to help the jury in eyewitness identification from the scientific point of view." Although defendant cites this incident as misconduct, or evidence of hostility, he does not — indeed, cannot — contend that the court's ruling so circumscribing Dr. Shomer's testimony was erroneous. To the extent defendant contends that the court threatened to strike Dr. Shomer's entire testimony if he violated the admonition, he misreads the record. In context, the court clearly was referring to striking only offending testimony. Nothing suggests that the court was threatening to punitively strike the entire testimony if it was otherwise admissible.

Defendant contends that the court "abruptly cut off Dr. Shomer's testimony repeatedly" without objection by the prosecution. He mischaracterizes the record. Dr. Shomer's answers to questions during his testimony sometimes lacked focus and strayed into irrelevant matters or areas not covered by the question. The court simply attempted to confine his testimony to the questions presented, and not let him stray into inadmissible areas.

10

As evidence of misconduct, defendant relies on one incident in which the court interrupted Dr. Shomer. In that instance, after Dr. Shomer had answered a question concerning whether eyewitness identification was a new area of study, Dr. Shomer sought to state that "[r]ecently, the New Jersey Supreme Court has identified over 2000 specific . . . ." The court told him to "[s]top" because he was not to refer to other cases. There is obviously nothing inappropriate in the court's obviating the danger that, having already answered the question asked, Dr. Shomer was about to testify concerning more than 2,000 cases identified by the New Jersey Supreme Court.

Similarly, defendant refers to the court's comment that a question—whether there are organizations which use research on eyewitness identification to advise on proper procedure—called for a yes or no answer. He fails to explain why this was improper; indeed, it was not, because the question *did* call for a yes or no answer.

Defendant complains that in response to a prosecution objection the court stated, "Thank you. Sustained." Such words are a common (and polite) way of ruling on an objection, and nothing in the record suggests that in saying "Thank you," the court was attempting to encourage objections or to cast negative aspersions on Dr. Shomer's testimony.

Defendant argues that the trial court improperly cut off Dr. Shomer's response to defense counsel's question concerning factors that might explain why a witness could identify a person in a photo six-pack, but later be unable to identify the same person in a live lineup. In the cited incident, Dr. Shomer had already answered the question (in four paragraphs of uninterrupted testimony in the reporter's transcript), and was beginning to say, "Now, you say, well, what if there was a time difference and the person looks different?" The court interrupted at that point, because Dr. Shomer was straying off topic. The court's ruling—"That's not the question. . . . You can't just — Next question, please"—was not misconduct. Also, at that point defense counsel stated she had no further questions. Thus, Dr. Shomer's testimony on direct examination ended not because the court cut off relevant testimony, but because defense counsel had completed her examination.

11

Defendant contends the trial court disparaged Dr. Shomer's research methods when it sought to clarify Dr. Shomer's testimony concerning the subjects of his last research 20 years ago by asking: "So let me just get it straight, just so my jury is straight. Your research subjects when you were doing this twenty-plus years ago are your students; is that right? . . . That's your population pool." Dr. Shomer testified that he was relying on "the research itself, not my subjects, but the research is based on college students, a large number of students. They [*sic*] are also based on soldiers and people in the community . . . ." The court followed up: "Okay. Stop. I just want to make sure that it's clear that the research uses self-selected samples . . . . It's not like a random survey where you go out into the shopping mall and get . . . enough until you get 1460-some odd and call it a random under . . . the sampling standards, right? We're talking about self-selected samples?"

Dr. Shomer corrected the court in a lengthy response: "No, Your Honor. There is a big misunderstanding here. First of all, when you do those surveys, you do them with certain quota controls. They are really not random. They are quasi random. . . . Secondly, to talk about research methodology[,] self-selected is also not appropriate. There's no self-selection process. The people may apply but then there are certain criteria that they have to fulfill as well, and there is a balance between a controlled group and an experimental group, unlike in survey methodology where you don't assign a control group and an experimental group."

Defendant argues that by "disparaging" Dr. Shomer's methodology, the court forced him to disagree with the judge, which "would not likely sit well with the jury." The court's questions, though direct in tone, did not tend to disparage Dr. Shomer's methodology, but rather sought to elicit a precise response as to what that methodology was. Dr. Shomer responded appropriately, and nothing in the court's conduct or his response suggested anything that might improperly affect the jury's ability to evaluate Dr. Shomer's testimony.

Finally, defendant contends that the court acted improperly when it attempted to rephrase a question by the prosecution concerning whether other evidence, such as

fingerprints, DNA, or cell phone records, that tends to corroborate an eyewitness identification can be used to test the accuracy of the identification. We find nothing improper—and certainly nothing remotely arising to the level of judicial misconduct—in the court's question.

In short, the record does not support any of defendant's claims of misconduct. Far from assuming the role of the prosecutor, the court maintained the appearance, and reality, of impartiality.

## II. The Court's Failure to Hold a Competency Hearing Sua Sponte

Defendant contends that the judgment of conviction must be reversed because, during the bench trial on the prior prison term allegations, the trial court failed to suspend the proceedings and hold an evidentiary hearing to determine whether defendant had the mental competence to assist in his defense. We disagree.

### A. The Relevant Proceedings

Defendant does not contend that he displayed behavior in front of the jury that would raise a reasonable doubt regarding his mental competence to stand trial. It was only after the jury returned guilty verdicts and the court attempted to hold a bench trial on the prior prison term allegations that defendant's behavior deteriorated and he repeatedly disrupted the proceedings. On the fifth day on which the court was attempting to proceed with the trial of defendant's priors, defendant blurted out before the court had called the proceedings to order, "make sure you get my medications fine." He said he was not getting his shots, "[h]igh blood pressure check, sugar, sugar, sugar." He said he had been given two shots against his will and held in "five point restraints." He said that the FBI would "come in here and . . . shut it down. President be here first in the morning . . . ." He said he would not take any more shots, that he would not do it anymore, and that he was tired. The court said, "let me advise you I can proceed in this trial in absentia . . . if you decide not — if you decide to disrupt the proceedings, okay. You don't have to be here. This is your constitutional right to be in court." Defendant said, "I don't want to be

13

here, Your Honor, because —" The court interjected, seeking confirmation, "You don't want to be here?" Defendant reiterated that he had been tied in five-point restraints. "That's what they are going to do, tie me down again, give me two shots last night and I got to go."

The court then stated for the record the history of the bench trial proceedings. On the first hearing day, defendant decided to drool and refused to provide his fingerprints. The following day he provided his fingerprints but brought feces in his pocket into the courtroom to disrupt the proceedings. The third day he went to the medical ward claiming he had a medical condition. The fourth hearing day, he decided not to come to court and the court issued an extraction order to compel his attendance. In light of this history, the court concluded it would respect his wish not to be present. At that point, defendant again interrupted the proceedings by complaining about being put in restraints, then abruptly said, "I love you all. Bye. See you all next year. The President be here." He then exited the courtroom.

The court addressed defense counsel, stating that every time the court attempted to conduct the priors trial, defendant disrupted the proceedings. Defense counsel said, "during the course of the time that [defendant] was present in court, he was mumbling under his breath, indicating that he had received two shots last night, that he was put in five-point restraints and saying other things to the court that are — that were incoherent." The court responded, "I respectfully disagree saying that the words uttered to the court are incoherent. They are quite clear to me. He says that he's going to have the F.B.I. investigate us and I think that that is very cognitive thinking. But that is a matter of difference of opinion between you and me and the record is clear on that." Counsel clarified that defendant was mumbling things she did not understand, things that were incoherent. The court then resumed the proceedings.

### B. *The Sentencing Report*

Defendant also points to the sentencing report submitted by defense counsel that the court reviewed before the priors trial and sentencing, arguing that it should have

14

informed the court about defendant's behavior and resulted in the court holding a competency hearing. The sentencing report documented defendant's history of mental illness, including the fact a section 1370 evaluation had been ordered in 2004 that concluded defendant appeared to be responding to internal stimuli. He readily admitted to being mentally ill because he had auditory and visual hallucinations. Born in 1980, he had been hospitalized for psychiatric disorders numerous times between 1994 and 1999 and during that time was diagnosed with schizophrenia. In 1996, he was confined for 10 months in a locked treatment facility for emotionally disturbed teenagers after being convicted of robbery and personal use of a dangerous weapon. In 2006, while incarcerated for possession of a firearm by a felon and robberies committed in 2004, defendant was found to be in need of involuntary administration of anti-psychotic medication because he was gravely disabled and psychotically agitated. He had paranoid fears that electronic chips were being implanted in his medication and refused to willingly ingest his medication on that ground. His illness improved markedly when he was given monthly injections of anti-psychotic drugs, but if his medication was discontinued he would rapidly decompensate. After being released from prison on parole in 2008, he was admitted in July 2009 to a psychiatric treatment facility at Community Hospital of San Bernardino due to depression and schizoaffective disorder. While there he repeatedly smeared feces and threatened to smear feces as a way of attempting to have his demands met. He was administered various psychotropic drugs to treat his schizoaffective disorder and modify his behavior.

### C.     Applicable Law

Due process prohibits trying or convicting a defendant who is mentally incompetent. (*People v. Rogers* (2006) 39 Cal.4th 826, 846.) "A defendant is mentally incompetent . . . if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) "It shall be presumed that the defendant is mentally competent unless it is proved by a

15

preponderance of the evidence that the defendant is mentally incompetent." (§ 1369, subd. (f).)

While a defendant is presumed mentally competent (§ 1369, subd. (f)), due process requires that the trial court conduct a full competency hearing when the accused presents substantial evidence of incompetence. (*People v. Jones* (1991) 53 Cal.3d 1115, 1152.) "Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competency to stand trial." (*Moore v. United States* (9th Cir. 1972) 464 F.2d 663, 666.) "At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time." (§ 1368, subd. (a).) The inquiry is whether there was evidence of incompetence such that a judge would be expected to experience a reasonable doubt respecting the defendant's competence. (*People v. Howard* (1992) 1 Cal.4th 1132, 1163.) Inappropriate or even bizarre courtroom behavior, standing alone, is typically insufficient to require a trial judge to suspend proceedings for a competency hearing. (*People v. Marshall* (1997) 15 Cal.4th 1, 33.) We review a trial court's decision whether to grant a competency hearing for abuse of discretion. (*People v. Ramos* (2004) 34 Cal.4th 494, 507.)

### D. Analysis

There is no indication in the record on appeal that defense counsel felt that defendant was unable to understand the nature of the criminal proceedings or to assist her in the conduct of a defense in a rational manner. Counsel did not declare a doubt about defendant's competency. Other than defendant's mumbling something that defense counsel could not understand—by no means necessarily a sign of derangement—defense counsel said nothing to the court about defendant's actions. Defendant's statement that he was in five-point restraints and did not want to be there indicated he was aware of his surroundings and knew he was addressing the court. Of course his obstreperous, disruptive behavior was not helpful to his defense, but that is not the standard the court

16

was called upon to consider in determining on its own motion that a competency hearing was required. Even given defendant's history of mental illness, the statute requires that the determination be based on "the mental competence of the defendant *at that point in time*." (§ 1368, subd. (a), italics added.) The trial court concluded that defendant's behavior was intentionally disruptive and his cognitive abilities were intact. Defense counsel in no way indicated that defendant was unable to assist counsel in the conduct of a defense in a rational manner. (§ 1367, subd. (a).) As the trial court impliedly indicated, defendant understood the nature of the criminal proceedings and sought to disrupt them. Sentencing was imminent and defendant engaged in bizarre, unruly behavior in a desperate attempt to delay or avoid the inevitable. We find no abuse of discretion in the trial court's decision not to suspend the proceedings to hold a competency hearing.

## III. Conducting Sentencing in Defendant's Absence

Defendant next argues that his rights to confrontation and to due process were violated when the trial court proceeded with the sentencing hearing without securing an intelligent, knowing, and voluntary waiver of defendant's right to be present for the proceedings. He argues he did not know sentencing would follow the priors trial and did not indicate he wished to be absent for *all* future proceedings. He contends that the court was required to ensure defendant fully understood his rights but failed to do so, requiring reversal as structural error. We disagree.

### A. The Relevant Proceedings

As stated in the previous section (Discussion II.A., *ante*), when defendant appeared in court for the priors trial after attempting to disrupt the proceedings for several days, he again was disruptive and the court informed him, "let me advise you I can proceed in this trial in absentia . . . if you decide not — if you decide to disrupt the proceedings, okay. You don't have to be here. This is your constitutional right to be in court." Defendant said he did not want to be there. The court outlined his behavior over

17

the preceding days, and in light of those events, the court concluded it would respect defendant's wish not to be present.

When the court concluded the bench trial, it immediately proceeded to sentencing. Defendant continued to be absent throughout the sentencing proceedings.

Prior to imposing sentence, the trial court inquired of defense counsel whether there was any legal cause, other than her *Romero*[3] motion, why sentence should not be imposed. Counsel replied in the negative.

### B.      Applicable Law

The confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment of the United States Constitution guarantee that a criminal defendant has a right to be personally present at trial. (See *United States v. Gagnon* (1985) 470 U.S. 522, 526 ["we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him"]; *People v. Rodriguez* (1998) 17 Cal.4th 253, 257; *People v. Arbee* (1983) 143 Cal.App.3d 351, 355-356; §§ 977, subd. (b)(1), 1193, subd. (a).) Section 15 of article I of the California Constitution and sections 977 and 1043 require the defendant to be present at trial, sentencing, and pronouncement of judgment. (*People v. Blacksher* (2011) 52 Cal.4th 769, 798-799; *People v. Rodriguez*, *supra*, 17 Cal.4th at p. 257.) While the right to be present during critical criminal proceedings is protected by the United States Constitution and by state constitutional and statutory law, a defendant may waive that right. (*People v. Davis* (2005) 36 Cal.4th 510, 532-533.)

Under the federal Constitution, we review any error for prejudice under the beyond-a-reasonable-doubt test in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Robertson* (1989) 48 Cal.3d 18, 62; *People v. El* (2002) 102 Cal.App.4th 1047, 1050; *Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1172-1173.) State law error is reversible only if it is reasonably probable that a more favorable result would have been

---

[3]      *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

18

reached in the absence of error.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1196; *People v. Jackson* (1996) 13 Cal.4th 1164, 1211; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### C.    *Harmless Error Analysis*

Defendant absented himself from the hearing on his alleged priors; there is no evidence that defendant consented to being absent for the sentencing proceedings.  There is no evidence in the record that allows us to conclude that he knowingly and intelligently waived his right to be present at sentencing, and he did not execute a written waiver in compliance with section 977.  However, even if we assume, without deciding, that the trial court erred in conducting sentencing in his absence, reversal of the judgment is not required because the error, if any, was harmless.

We disagree with defendant's assertion that the error alleged here is not subject to harmless error analysis.  On the contrary, when confronted with the defendant's improper absence from a criminal proceeding, courts have routinely considered whether the error was harmless or prejudicial under *Chapman v. California*, *supra*, 386 U.S. 18, as to the federal constitutional right, and *People v. Watson* (1956) 46 Cal.2d 818, 836, as to the right under state law.  (See also *People v. Romero* (2008) 44 Cal.4th 386, 419; *People v. Davis*, *supra*, 36 Cal.4th at pp. 532-533; *People v. Young* (2005) 34 Cal.4th 1149, 1214 [error in accepting oral waiver under §§ 977 and 1043 was harmless]; *People v. Robertson*, *supra*, 48 Cal.3d at p. 62; *People v. Dickey* (2005) 35 Cal.4th 884, 923 [although capital defendant may not waive statutory right to be present at trial, error is reversible only if prejudicial; i.e., if there is a reasonable possibility the jury would have reached a different result absent the error].)

A "defendant whose right of personal presence [is] denied bears the burden of demonstrating prejudice." (*People v. Wilen* (2008) 165 Cal.App.4th 270, 290.) Defendant has not shown that he was prejudiced by his absence from sentencing.  His counsel ably represented him, bringing a *Romero* motion and arguing against consecutive sentences.  Defendant does not suggest in what manner his presence would have made a difference in the outcome.  Defendant instead only argues that this error is structural,

requiring reversal per se. Suffice it to say that we disagree. "As pointed out in *People v. Isby* (1947) 30 Cal.2d 879, 894, quoting Mr. Justice Cardozo in *Snyder v. Massachusetts*, 291 U.S. 97, 106-108, in relation to the constitutional guaranty of due process, "'[n]owhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow. . . . [Rather] the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." . . . The determinative question is whether or not the accused suffered any damage by reason of absence at a particular stage of the proceedings.'" (*In re Jimenez* (1969) 269 Cal.App.2d 621, 624.) Defendant's absence from sentencing was harmless beyond a reasonable doubt; likewise, it was not reasonably probable a result more favorable to defendant would have been reached had he been present.

## IV. Denial of *Romero* Motion

Defendant contends the trial court abused its discretion when it refused to strike at least one of his prior robbery convictions that arose from a single act but involved two victims. We disagree.

### A. *The Relevant Proceedings*

At sentencing, defense counsel argued that the trial court should strike one of defendant's prior robbery "strike" convictions because they arose from the "same course of action, two victims." Defense counsel cited *People v. Burgos* (2004) 117 Cal.App.4th 1209 (*Burgos*), representing that it held that the failure to dismiss one of the priors in this situation is always an abuse of discretion. Counsel further urged the court to take into account defendant's mental health history.

In denying the *Romero* motion, the trial court pointed to the fact that there were multiple victims in this case. In addition, "[defendant] did not lead a law abiding life from the time of the incident of the 211's, which there were multiple victims, to the time

20

that he has a carjacking attempt with four victims that he has picked up under the case that I have read off and have founded on the person priors trial.  The more important thing is that the acts are getting more serious as time goes on and I'll share with you the reason why:  the last time he was willing to — because carjacking really is a form of robbery . . . .  The last time he was willing to take on two victims, this time he's willing to take on four victims, two of which were children, putting a lot of people in danger.  He has not lived a law abiding past between the time of the 211 and the current case."[4]  The court then imposed sentence.

### B.     Applicable Law

"[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, 'in furtherance of justice' pursuant to Penal Code section 1385[, subdivision] (a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

A court's failure or refusal to dismiss or strike a prior conviction allegation under section 1385 is subject to review under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 375.)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a

---

**4**     The probation report reveals that defendant was arrested in April 2003 for robbery, and convicted in June 2004.  In the interim, he was arrested for and convicted of battery in July 2003, for which he served five days in jail.  In any event, we note that the court considered the most important factor to be the increasing seriousness of defendant's crimes.

21

showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" [Citations.] Second, a "'decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra*, 33 Cal.4th at pp. 376-377.)

### C.    Analysis

In *People v. Benson* (1998) 18 Cal.4th 24, 26-27 (*Benson*), our Supreme Court held that when a defendant has previously suffered two strike convictions, one of which was stayed pursuant to section 654, both convictions are properly treated as strikes for future sentencing purposes. The court declined to determine "whether there are some circumstances in which two prior felony convictions are so closely connected—for example, when multiple convictions arise out of a single act by the defendant as distinguished from multiple acts committed in an indivisible course of conduct—that a trial court would abuse its discretion under section 1385 if it failed to strike one of the priors." (*Id.* at p. 36, fn. 8.)

In reliance on footnote 8 of *Benson, supra*, the court in *Burgos, supra*, 117 Cal.App.4th 1209, found that the trial court had abused its discretion in declining to strike the defendant's prior strike convictions for robbery and carjacking. (*Id.* at p. 1216.) The *Burgos* court concluded that "where the two priors were so closely connected as to have arisen from a single act, it would *necessarily* constitute an abuse of discretion to refuse to strike one of the priors." (*Id.* at p. 1215, italics added.)

In contrast, the court in *People v. Scott* (2009) 179 Cal.App.4th 920 (*Scott*), disagreed with the analysis used in *Burgos*, instead concluding that the "'same act' circumstances posed by robbery and carjacking cases *provide a factor for a trial court to consider*, but do not *mandate* striking a strike." (*Id*. at p. 931, italics added.) This issue

22

is currently pending for review before the Supreme Court in *People v. Vargas* (2012) 206 Cal.App.4th 971 (review granted Sept. 12, 2012, S203744).

Suffice it to say that we find more compelling the rationale relied upon in *Scott*: "Whichever rule *Burgos* meant to announce, we conclude the 'same act' circumstances posed by robbery and carjacking cases provide a factor for a trial court to consider, but do not *mandate* striking a strike. [¶] Some of the confusion in *Burgos* may stem from its failure to discuss the *definition of a strike:* As stated, whether something is a strike 'is not affected by the sentence imposed unless the sentence automatically, upon the initial sentencing, converts the felony to a misdemeanor.' (§ 1170.12, subd. (b)(1).) This negates a broad reading of *Burgos.*

"Further, although it was not viewed as dispositive, *Burgos* used the sentencing limitation provided by section 215, subdivision (c) to 'reinforce[]' its conclusion. (*Burgos, supra,* 117 Cal.App.4th at p. 1216.) But *Benson* undermines this view, because the defendant was on notice that the three strikes law would treat both convictions as strikes, and therefore that he 'would be treated as a recidivist if he reoffended.' (*Benson, supra,* 18 Cal.4th at p. 35.) In *People v. Nguyen* (2009) 46 Cal.4th 1007, the California Supreme Court recently upheld the use of juvenile adjudications as strikes, partly because such an adjudication puts the person on notice that, upon reoffense, she or he will be punished as a recidivist. (*Id.* at p. 1024 ['Sentence enhancement based on recidivism flows from the premise that the defendant's current criminal conduct is more serious because he or she previously was found to have committed criminal conduct and did not thereafter reform.'].)" (*Scott*, *supra*, 179 Cal.App.4th at p. 931.) Defendant chose to reoffend, knowing that he had two prior strike convictions. He was "entitled to . . . consideration by the trial court of the closeness of the two strikes in determining whether, *in the exercise of discretion,* one should be stricken. The trial court considered that factor, but, in the exercise of its discretion, did not find that his violent record justified treating those two strikes—albeit arising from the same act—as one." (*Ibid.*)

The court, in the exercise of its discretion, considered the entirety of defendant's criminal history, including the fact that the current offense involved two children and

23

presented a risk of grave danger to multiple people. The court was well aware of defendant's mental health history, but implicitly concluded that it did not outweigh or sufficiently mitigate the seriousness of defendant's crimes and his recidivism. We find no abuse of discretion in the court's refusal to strike one of the prior strikes arising out of the 2004 robbery conviction.

## V. Conviction of Attempted Carjacking as to Victims Without Possessory Control

In *People v. Hill* (2000) 23 Cal.4th 853, 860-861 (*Hill*), the California Supreme Court held that the crime of carjacking under section 215 is a crime not only against the owner or driver of the car from whom the car is taken, but also to occupants (there, an infant) without a possessory interest in the car. The court reasoned in part: "The Legislature recently made carjacking a separate crime, and for a good reason. '[C]arjacking is a particularly serious crime that victimizes persons in vulnerable settings and, because of the nature of the taking, raises a serious potential for harm to the victim, the perpetrator and the public at large.' [Citations.] The potential for harm is not less because the victim is an infant who, we may assume, is incapable of giving or withholding consent. Here, for example, [the infant] faced great potential harm. A baby of seven months and unbuckled from her car seat, she was rolling around the front of a vehicle in motion. In practical effect, [the infant], like her mother, was a carjacking victim. We believe she was also a victim in legal effect. For these reasons, we conclude that an infant, like any person, *may* be the victim of a carjacking." (*Id.* at pp. 859-860.)

The court also rejected the purported analogy between robbery and carjacking: "Relying on robbery cases, [defendant] argues he cannot be guilty of carjacking someone who is unconscious or otherwise unaware of the taking . . . , and that the baby here was unaware of the taking. We disagree. The analogy between robbery and carjacking is imperfect. Unlike robbery, which requires a taking from the person or immediate presence of the *possessor* (§ 211), the Legislature expanded the taking element [of carjacking] to a taking from the person or immediate presence of *either* the possessor *or*

24

any passenger. (§ 215, subd. (a).) By extending carjacking to include a taking from a passenger, even one without a possessory interest (assuming the other elements of the crime are present), the Legislature has made carjacking more nearly a crime against the person than a crime against property. Moreover, unlike a robbery, a carjacking subjects an unconscious possessor or occupant of a vehicle to a risk of harm greater than that involved in an ordinary theft from an unconscious individual. Accordingly, if the defendant used force or fear, as we found he did here, he is guilty of carjacking whether or not the victim was aware of that force or fear." (*Hill*, *supra*, 23 Cal.4th at pp. 860-861, fn. omitted.)

In the instant case, although defendant concedes that *Hill* is binding on this court, he urges that it be reconsidered and his convictions of the attempted carjackings of Jackson and the two children, Alisa and Crylene, be vacated, leaving only a single conviction for the carjacking of Bachicha. Under the doctrine of stare decisis (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456), we are bound by *Hill* and cannot reconsider it.

## VI. Cruel and Unusual Punishment

Defendant mounts what is, in essence, another challenge to *Hill*, *supra*, 23 Cal.4th 853, in the context of his contention that his sentence of 115 years to life constitutes cruel and/or unusual punishment under the Eighth Amendment of the federal Constitution and article I, section 17 of the California Constitution.[5] However, because he failed to raise this argument in the trial court, it is forfeited. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993 (*Russell*).) In any event, the claim fails.

To challenge *Hill* in the three strikes context, defendant relies on the third technique of analysis set forth in *In re Lynch* (1972) 8 Cal.3d 410, 427, "i.e., a comparison of the challenged penalty with the punishments prescribed for the *same*

---

[5] The federal Constitution prohibits cruel "and" unusual punishment, whereas the California Constitution prohibits cruel "or" unusual punishment. (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1084.)

*offense* in *other jurisdictions* having an identical or similar constitutional provision. . . . [T]he assumption is that the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness."

Defendant contends that 33 states do not have carjacking statutes, and thus the taking of a vehicle by force or fear is prosecuted under their robbery statutes. In those states, he argues, on the same facts as the instant case he could have been convicted of, and punished for, only one crime. Further, he contends that in the 17 states that have carjacking statutes, multiple convictions for a single taking are often not available, because those states construe their carjacking statutes consistently with their robbery statutes. To support this proposition, he cites cases from Michigan, Mississippi, Tennessee, and Virginia. He concedes that the New Jersey carjacking statute permits multiple convictions, regardless of the victim's possessory interest in the vehicle, but attempts to downplay the significance of that statute by suggesting that juries do not always convict of multiple counts (he cites a New Jersey case in which the jury convicted as to the passenger but not the driver). The conclusion defendant reaches is that in the vast majority of states, he would have been convicted of a single crime, and (even under three strikes sentencing) would have been sentenced on a single crime, thereby avoiding a 27-year-to-life sentence on three of the counts involved in this case.

We reject defendant's challenge to *Hill* in the three strikes context. The sentencing provision that results in the "draconian" sentence he challenges is not the carjacking statute as interpreted in *Hill*, but the Three Strikes law itself as applied to the crime of carjacking in a multi-victim case. As defendant concedes, however, recidivist punishment statutes such as the Three Strikes law do not constitute cruel or unusual punishment. As held in *People v. Haller* (2009) 174 Cal.App.4th 1080, 1094: "the fact that defendant's current offenses might not qualify for recidivist sentencing in other states does not render the California punishment cruel or unusual. 'That California's

26

punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require "conforming our Penal Code to the 'majority rule' or the least common denominator of penalties nationwide." [Citations.]'" (See also *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.)

Thus, the fact that in certain other jurisdictions defendant would have been convicted of only a single crime, making him eligible for an increased sentence as a recidivist offender only on that crime, is beside the point. Because of the grave danger presented by carjacking, California defines the crime so as to include as victims occupants who are present, even though they have no possessory interest in the vehicle. When a third strike defendant is convicted of multiple counts of carjacking under that principle, he is subject to punishment as a recidivist offender on each of those crimes. In that context, it cannot be said under the third technique of *Lynch* that imposition of such a sentence on a recidivist offender "'shows more than [a] different exercise[] of legislative judgment'" from other states or "'a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice.'" (*Lynch, supra,* 8 Cal.3d at p. 437.)

Defendant also challenges the constitutionality of his sentence under the first technique identified in *Lynch*, under which the court examines "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (8 Cal.3d at p. 425.) However, because he failed to raise the claim in the trial court, it is forfeited. (*Russell, supra,* 187 Cal.App.4th at p. 993.) In any event, under this technique as well defendant's sentence passes muster.

In the present case, he was convicted of four counts of attempted carjacking. Two of the victims were children, ages approximately eight and 15. He used a weapon (a pellet gun) that appeared to be a real gun. The entire incident was fraught with danger to the safety of everyone involved based on defendant's conduct and violent threats, and the risk that the adult victims might resist in order to protect the children involved.

27

Moreover, the incident occurred in a condominium parking lot, which potentially placed at risk other persons who parked their cars there and might have been present. Defendant has a lengthy criminal history, including two prior robbery convictions. That ultimately no one was injured, that no property was taken, and that defendant has a history of mental instability do not outweigh the aggravated nature of his present case viewed in light of his criminal history. Under all the circumstances of the case, it cannot be said that defendant's sentence "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch, supra,* 8 Cal.3d at p. 424, fn. omitted.)

## VII. The Abstract of Judgment Must Be Amended to Reflect Additional Fines Imposed

Respondent points out that the abstract of judgment fails to reflect the orally pronounced $1,000 assessment and surcharge imposed upon defendant pursuant to section 1464 and Government Code section 76000. Additionally, the abstract of judgment should be modified to reflect the $160 court security fee pursuant to section 1465.8 ($40 per count), and the $120 criminal conviction assessment pursuant to Government Code section 70373 ($30 per count). We so order. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate courts may correct clerical errors].)

## DISPOSITION

We direct the trial court to correct the abstract of judgment to reflect the court's oral pronouncement of fines and fees, and to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.   The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:

EPSTEIN, P. J.

WILLHITE, J.

---

[*]   Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.